# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RACHEL STYCZYNSKI** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 18-2662** |
| **v.** | : | |
| | : | |
| **MARKETSOURCE, INC., and** | : | |
| **ALLEGIS GROUP, INC.** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                    **November 30, 2018**

## MEMORANDUM

This is an action where plaintiff alleges that she experienced sexual harassment severe enough to create a hostile work environment, forcing her to resign.  The defendant employers have moved to compel arbitration under the terms of an employment contract.  Some five years ago, Judge Schiller of this Court faced a similar case and wrote an eloquent opinion enforcing the contract, while expressing his misgivings about the result he was compelled to reach. *Porreca v. Rose Group*, 2013 WL 6498392 (E.D. Pa. Dec. 11, 2013).  Like Judge Schiller, I am also bound to order that this case proceed to arbitration.  But since his decision was issued, there has been increasing scholarly research into the adequacy and fairness of arbitration as the primary mechanism for enforcing federal laws governing the workplace.  Although consideration of that growing body of literature is ultimately the province of higher courts and Congress, I conclude this opinion with a review that underscores why there is legitimate cause for concern when a parallel system of dispute resolution supplants the courts as the primary means of enforcing the law.

## I.     Factual and Procedural Background

Plaintiff Rachel Styczynski was formerly employed by Defendants MarketSource, Inc. and Allegis Group.  Pl.'s Am. Compl. 1, ECF No. 7.  Allegis "is the largest privately-held talent management firm in the world" and MarketSource is its wholly owned subsidiary.  *Id.* 3; Defs.' Mot. Dismiss 3, ECF No. 8-1.  Plaintiff was promoted by Defendants several times over the course of her four-year employment with them:  first to Sales Manager, then to Electronics and Entertainment Lead, and finally to District Manager.  Pl.'s Am. Compl. 7-8, 15.  But Plaintiff's career path stalled after a male supervisor repeatedly harassed her, touching Plaintiff inappropriately and prying into her sexual orientation and marital status.  *Id.* 8-9.  Plaintiff alleges that Defendants' response was inadequate, discriminatory, and retaliatory.  *Id.* 1-2, 8-9, 15.  Defendants purportedly failed to address the harassment, commanded that Plaintiff continue reporting to and working alongside her harasser, and created a hostile work environment that ultimately forced Plaintiff to resign.  *Id.* 1-2, 15.

Upon resigning, Plaintiff filed multiple discrimination charges with the U.S. Equal Employment Opportunity Commission, which issued Plaintiff a Notice of Right to Sue.  Pl.'s Am. Compl. 6-7, Ex. 4.  Plaintiff subsequently filed suit in this court asserting federal question and supplemental claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*.  *Id.* 2.  She seeks declaratory, injunctive, and compensatory relief, including punitive damages and attorney's fees.  *Id.* 19-20.

Defendants move to dismiss on the basis of a three-page document Plaintiff signed when she was promoted to District Manager. Defs.' Mot. Dismiss 1, 2. This document contains contractual language and reads as follows:

MUTUAL ARBITRATION AGREEMENT ("AGREEMENT")

As consideration for my application for and/or my employment with MarketSource, Inc. and for the mutual promises herein, I and the Company (as defined below) (each a "party" and collectively "the parties") agree that:

Except (i) as expressly set forth in the section, "Claims Not Covered by this Agreement," all disputes, claims, complaints, or controversies ("Claims") that I may have against MarketSource and/or any of its subsidiaries, affiliates, officers, directors, employees, agents, and/or any of its clients or customers (collectively and individually the "Company"), or that the Company may have against me, including contract claims; tort claims; discrimination and/or harassment claims; retaliation claims; claims for wages, compensation, penalties, or restitution; and any other claim under any federal, state, or local statute, constitution, regulation, rule, ordinance, or common law, arising out of and/or directly or indirectly related to my application for employment with the Company, and/or my employment with the Company, and/or the terms and conditions of my employment with the Company, and/or termination of my employment with the Company (collectively "Covered Claims"), are subject to a confidential arbitration pursuant to the terms of this Agreement and will be resolved by Arbitration and NOT by a court or jury. The parties hereby forever waive and give up the right to have a judge or a jury decide any Covered Claims.
. . . .

While I have the right to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board ("NLRB"), the Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency, if any federal, state or local administrative agency proceeding does not finally resolve the Covered Claim, the parties must submit the claim to arbitration under this Agreement.
. . . .

<u>Arbitration Procedures</u>
- The parties will use Judicial Arbitration and Mediation Services ("JAMS") subject to its then-current employment arbitration rules and procedures (and the then-existing emergency relief procedures contained in the JAMS comprehensive arbitration rules and procedures if either party seeks emergency relief prior to the appointment of an Arbitrator), available at www.jamsadr.com, unless those rules and/or procedures conflict with any express term of this Agreement, in which case this Agreement is controlling; . . . .

- The Arbitrator shall issue a final and binding written award, subject to review on the grounds set forth in the FAA . . . .

<u>Arbitration Fees and Costs</u>
- I will pay any JAMS filing or administrative fee up to the amount of the initial filing fee to commence an action in a Court that otherwise would have jurisdiction ("filing fee"), and the Company will pay any amount in excess of the filing fee.
- The Company will pay any other JAMS administrative fees, the Arbitrator's fees, and any additional fees unique to arbitration.
- I will pay my own attorneys' fees and all other costs and fees that I incur in connection with the Arbitration.
- The Company will pay its own attorneys' fees and all other costs and fees that it incurs in connection with the Arbitration.
- The Arbitrator will not have the authority to award attorneys' fees unless a statute or contract at issue in the dispute authorizes the award of attorneys' fees to the applicable prevailing party, in which case the Arbitrator shall have the authority to make an award of attorneys' fees to the full extent permitted by applicable law. If there is a dispute as to whether the Company or I am the prevailing party, the Arbitrator will decide this issue. . . . .

<u>Damages and Other Relief</u>
Any Covered Claims arbitrated hereunder are subject to the same affirmative rights to individual damages and other relief and the same limitations regarding damages and ability to obtain other relief as would have applied in a judicial forum. . . . .

<u>Governing Law</u>
This Agreement is governed by the FAA . . . .

All the text quoted above appears on the first two pages of the document; the text below appears on its own, on the last, third, page of the document:

<u>**I ACKNOWLEDGE THAT:**</u>
- I have carefully read this Agreement, understand the terms of this Agreement, and am entering into this Agreement voluntarily;
- I am not relying on any promises or representations by the Company except those contained in this Agreement;
- I am giving up the right to have Covered Claims decided by a court or jury;
- I have been given the opportunity to discuss this Agreement with my own attorney if I wish to do so; and
- My affirmative signature and/or acknowledgement of this Agreement is not required for the Agreement to be enforced. If I begin working for MarketSource without signing this Agreement, this Agreement will be effective, and I will be deemed to have consented to, ratified and accepted this Agreement through my acceptance of and continued employment with MarketSource.

Defs.' Mot. Dismiss Ex. B.

Plaintiff's signature appears on page 3 of the document, directly below the fifth bullet point of the above quoted acknowledgements section. *Id.* Next to it appears the name and title of Defendant MarketSource's Executive Director of Human Resources. *Id.* Defendants argue that this document constitutes a valid arbitration agreement between Plaintiff and Defendants that covers this dispute, bars Plaintiff from maintaining a civil action in this or any court, and requires Plaintiff to arbitrate all of her claims through JAMS.

## II.     Standard of Review

"A party to a valid and enforceable arbitration agreement is entitled to a stay of federal court proceedings pending arbitration as well as an order compelling such arbitration." *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003). Where, as here, a plaintiff has not "responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue," that motion "should be considered under a Rule 12(b)(6)

standard without discovery's delay." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (cleaned up).[1]  I therefore consider Defendants' motion under the well-established standard set forth in Federal Rule of Civil Procedure 12(b)(6), as elaborated in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

## III.    Discussion

The Federal Arbitration Act provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such conduct or transaction . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  The FAA also requires courts to enforce valid arbitration agreements.  *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 480 (1989).  A court considering a motion to stay and compel arbitration must determine (1) whether a valid agreement to arbitrate exists under the FAA and (2) whether the particular dispute falls within its scope.  *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).

To "decid[e] whether an arbitration agreement is valid under the FAA," federal courts must "look first to the relevant state law of contracts, here Pennsylvania."[2]  *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 214 (3d Cir. 2003) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  And, as with any agreement, state contract defenses such as unconscionability can invalidate an agreement to arbitrate.  *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) ("[G]enerally applicable contract defenses, such as fraud, duress, or

---

[1] This opinion uses (cleaned up) to indicate that extraneous, non-substantive information—such as internal quotation marks, alterations, and citations—has been omitted from quotations.  *See, e.g.*, *United States v. Steward*, 880 F.3d 983, 987 (8th Cir. 2018), reh'g denied (June 12, 2018); *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

[2] Pennsylvania law applies because Pennsylvania is where the agreement was formed.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Nationwide Mut. Ins. Co. v. Walter*, 290 Pa. Super. 129, 137 (1981).  Both parties agree that is the case.

unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA].”); *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 230 (3d Cir. 2012) (“We generally apply state contract principles to determine whether an arbitration agreement is unconscionable.”).

“To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable.” *Quilloin*, 673 F.3d at 230 (citing *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007). “[T]he Pennsylvania Supreme Court has indicated that “a ‘sliding-scale approach’” may be employed “so that ‘where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required’ and . . . vice-versa.” *Id.* (citing *Salley*, 925 A.2d at 125 n. 12). But while substantive and procedural unconscionability need not be present in *equal* amounts, both—in some amount—are necessary to invalidate an agreement. *Id.*

A. <u>The Arbitration Agreement Is Not Substantively Unconscionable.</u>

“Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent.” *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). The U.S. Supreme Court has rejected the broad assertion that arbitral panels are inherently favorable to one side, thereby invalidating the argument that a contract requiring arbitration is, on its own, substantively unconscionable. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) (“declin[ing] to indulge the presumption that the parties and the arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.”) (cleaned up). The U.S. Supreme Court has further clarified that this principle applies even though it limits employees’ rights, holding that mandatory arbitration that takes away employees’ access to

courts and attendant procedural protections is not inherently problematic. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001).[3] So in the absence of specific additional facts suggesting unconscionability or other grounds for invalidation, an arbitration agreement, even in an employment contract, must be enforced. *Id.*; *Edwards v. Hovensa, LLC*, 497 F.3d 355, 363 (3d Cir. 2007). That is true even if the agreement goes so far as to specify an individual arbitrator or the rules that will govern the arbitration. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting that the U.S. Supreme Court has "often observed that the Arbitration Act requires courts rigorously to enforce arbitration agreements according to their terms, including terms that specify *with whom* the parties choose to arbitrate their disputes and *the rules* under which that arbitration will be conducted") (emphasis in original) (cleaned up).

Provisions that can invalidate arbitration agreements on substantive unconscionability grounds include clauses "requiring parties to bear their own attorney's fees, costs, and expenses . . . . [and a] restriction on the arbitrator's ability to award attorney's fees, costs, and expenses." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 203 (3d Cir. 2010) (cleaned up). But limitations on discovery do not necessarily invalidate an arbitration agreement, so long as the plaintiff retained "a fair opportunity to present" her claim. *Gilmer*, 500 U.S. at 31. Lower courts, though, have identified some situations in which discovery in the arbitral forum was so severely limited that it could invalidate an arbitration agreementFor example, where arbitration rules governing discovery allowed only one deposition of right, the court expressed "major, serious concerns." *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F. Supp. 2d 985, 997 (S.D. Ind. 2003) (ultimately invalidating the arbitration agreement on grounds of procedural unconscionability,

---

[3] Contracts of employment of transportation workers are exempted by statute. *Circuit City Stores*, 532 U.S. at 121 (citing Section 1 of the FAA). Ms. Styczynski was not a transportation worker so this exemption to FAA coverage does not apply in this case.

lack of good faith and fair dealing, and lack of consideration). *See also Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 103 (D.D.C. 2004) ("[O]ne requirement for an enforceable arbitration agreement is that 'more than minimal discovery' be permitted."). In contrast, where an arbitrator had the discretion to expand discovery beyond a single deposition, the agreement was not found substantively unconscionable. *Ndanyi v. Rent-A-Center, Inc.*, 2004 WL 3254516, at *4 (E.D. La. Dec. 11, 2004).

Plaintiff's primary, global objection to arbitration cannot withstand the Supreme Court's pro-arbitration jurisprudence. Plaintiff argues that arbitration is "an inherently unfair and biased forum" that favors the Defendant corporation and not her, the victimized individual. Pl.'s Resp. Defs.' Mot. Dismiss 7, 16, ECF No. 9. But, the Supreme Court has flatly rejected the general proposition that arbitral panels are inherently biased and "decline[d] to indulge the presumption that the parties and the arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators." *Gilmer*, 500 U.S. at 30 (cleaned up).

Plaintiff's next, more specific contention is that she is disadvantaged by the JAMS rules and procedures for appointing arbitrators because they totally deny her the ability to gauge and challenge arbitrators' potential conflicts of interest and bias. Pl.'s Resp. Defs.' Mot. Dismiss 17. Under existing case law, I cannot agree. JAMS' own rules and procedures governing employment arbitration provide several avenues for assessing and challenging potential conflicts and bias. JAMS Rule 15 puts the initial burden on JAMS to "provide each Party with a brief description of the background and experience of each Arbitrator candidate" should the parties not agree on an arbitrator. *JAMS Employment Arbitration Rules & Procedures*, JAMS Alternative Dispute Resolution (July 1, 2014), https://www.jamsadr.com/files/Uploads/Documents/JAMS-

Rules/JAMS_employment_arbitration_rules-2014.pdf. JAMS Rule 14(b) allows for limited *ex parte* communication between a party and an arbitrator to *assure the absence of conflicts*. *Id.* Plaintiff therefore may probe for potential bias by either waiting for JAMS' provision of arbitrator backgrounds and experiences under Rule 15 or by initiating inquiries into a particular arbitrator's background under Rule 14(b).

And, even if conflicts and biases are present, JAMS Rule 15 somewhat allays Plaintiff's concern that she could not withstand the imposition of a partial arbitrator. Rule 15 provides that it is the parties, not JAMS, that drive the appointment of arbitrators in individual matters. *Id.* The rule provides that the parties have an opportunity in the first instance to agree on an arbitrator and, if they fail to agree, they still exercise some control over the appointment. *Id.* JAMS sends the parties a list of at least five candidates with a description of their background and experience and the arbitrator with the highest composite ranking is appointed to the matter. *Id.* Only if these two processes do not yield an arbitrator does JAMS make an appointment. *Id.* Plaintiff has made "no showing in this case that th[e]se provisions are inadequate to guard against potential bias," as required by *Gilmer*. 500 U.S. at 31.

Furthermore, the Federal Arbitration Act itself allows federal courts to vacate an arbitration award if: "there was evident partiality or corruption in the arbitrators;" an arbitrator "refus[es] to hear evidence pertinent and material to the controversy;" there was "any other misbehavior by which the rights of any party have been prejudiced;" or "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award on the subject matter was not made." 9 U.S.C. § 10(a)(2)-(4). The combination of the JAMS processes, together with the protections built into the FAA, prevent a finding of unconscionability.

Plaintiff's remaining arguments concern the arbitral forum's discovery limitations. As noted above, limitations on the scope and extent of discovery do not necessarily render an arbitration agreement substantively unconscionable. *Gilmer*, 500 U.S. at 31. But Plaintiff contends that her ability to fairly present her claims is limited by JAMS rules that limit discovery to *at least* one (1) deposition and an exchange of documents. Plaintiff fails to attribute proper significance to the phrase "at least." Plaintiff gets "at least" one deposition but quite possibly more. JAMS Rule 17(b) provides that the arbitrator has the discretion to determine "whether to grant a request for additional depositions, based upon the reasonable need for the requested information, the availability of other discovery and the burdensomeness of the request on the opposing Parties and witnesses." *JAMS Employment Arbitration Rules & Procedures*. If it is true that Plaintiff needs to take multiple depositions to fairly present her claims, I see no reason why the discretionary authority vested in arbitrators per JAMS' rules insufficiently meets her need. Although it is true that JAMS rules do not provide for interrogatories, as Plaintiff laments, she has not shown or even alleged that she needs the interrogatory procedure to fairly present her claim. Rule 17(a) mandates an informal exchange of all non-privileged documents and other information. *Id.* (outlining that the parties "shall complete an exchange of all relevant, non-privileged documents, including, without limitation, copies of all documents in their possession or control on which they rely in support of their positions, names of individuals whom they may call as witnesses at the Arbitration Hearing and names of all experts who may be called to testify at the Arbitration Hearing . . . ."). On the spectrum of discovery limitations—taking into account the required informal exchange of information and the arbitrator's discretionary authority to expand discovery beyond a single deposition—JAMS' are not so severe that they impede Plaintiff's ability to assert her legal claims. *Booker*, 315 F. Supp. 2d at 103 (more than minimal

discovery must be provided); *Geiger*, 134 F. Supp. 2d at 997 (expressing "major, serious concerns" where discovery allowed only one deposition of right).

And because Plaintiff has not pointed to any additional provisions in the arbitration agreement rendering it substantively unconscionable, she has failed to show that JAMS' processes deny her a fair opportunity to present her claim. *Nino*, 609 F.3d at 203. I have looked carefully through the agreement and dispose of the other potentially problematic provisions as follows: (1) What appears to be a restriction on the arbitrator's ability to award attorney's fees is simply a provision articulating that the arbitrator may not award fees unless authorized by law: "The Arbitrator will not have the authority to award attorneys' fees unless a statute or contract at issue in the dispute authorizes the award of attorneys' fees to the applicable prevailing party, in which case the Arbitrator shall have the authority to make an award of attorneys' fees to the full extent permitted by applicable law." Defs.' Mot. Dismiss Ex. B. (2) Requiring Plaintiff to otherwise pay her own attorneys' fees, costs, and expenses does not render the arbitration agreement unconscionable, as the same would be true in court but for statutory authorization. (3) The JAMS arbitral forum does not curb Plaintiff's rights to damages or other relief. By the very terms of the arbitration agreement, the claims arbitrated under the agreement "are subject to the same affirmative rights to individual damages and other relief and the same limitations regarding damages and ability to obtain other relief as would have applied in a judicial forum." *Id.* Plaintiff therefore has not shown that the arbitration agreement unreasonably or grossly favors Defendants and so failed to make the requisite showing of substantive unconscionability.

B.  The Arbitration Agreement Is Not Procedurally Unconscionable.

Because the U.S. Supreme Court has foreclosed most of Plaintiff's substantive unconscionability arguments and I have rejected the others, I do not need to determine whether

the arbitration agreement is procedurally unconscionable. *See Quilloin,* 673 F.3d at 230. "To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable." *Id.* (citing *Salley v. Option One Mortg. Corp.,* 925 A.2d 115, 119 (2007)). I nevertheless address Plaintiff's allegations of procedural unconscionability for the sake of analytical completeness and because, had Plaintiff raised more specific allegations of substantive unconscionability, the result here might have been different.[4]

"Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." *Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 181 (3d Cir. 1999) (citing E. Allan Farnsworth, Contracts § 4.28 (2d ed. 1990)). Under Pennsylvania law, "[a] contract is procedurally unconscionable where 'there was a lack of meaningful choice in the acceptance of the challenged provision.'" *Quilloin,* 673 F.3d at 235 (quoting the Pennsylvania Supreme Court in *Salley,* 925 A.2d at 119). A contract of adhesion is generally, though not always, considered to be procedurally unconscionable. *Quilloin,* 673 F.3d at 235 (citing *McNulty v. H & R Block, Inc.,* 843 A.2d 1267, 1273 & n. 6 (Pa. Super. Ct. 2004) and *Salley,* 925 A.2d at 125-28). "A contract of adhesion is a 'standard-form contract prepared by one party, to be signed by the party in a weaker position . . . who adheres to the contract with little choice about the terms.'" *Quilloin,* 673 F.3d at 235 (quoting *Chepkevich v. Hidden Valley Resort, L.P.,* 2 A.3d 1174, 1190 (2010) (internal citation and quotation marks omitted)). But the U.S. Supreme Court has explained that "[m]ere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Gilmer,* 500 U.S. at

---

[4] Further discussion is also warranted, because under *Salley's* sliding-scale approach, "where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required." *Salley,* 925 A.2d at 125 n. 12.

33. "Parties frequently possess varying degrees of bargaining power, and there is a 'range of ordinary and acceptable bargaining situations[.]'" *Quilloin*, 673 at 235 (quoting *Salley*, 925 A.2d at 120 n.3).

Still, "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." *Gilmer* at 33 (cleaned up). So my "role is to distinguish acceptable bargaining situations from those that violate 'strong public policy[.]'" *Id.* *Quilloin*, 673 at 235 (quoting *Salley*, 925 A.2d at 120 n. 3). There is no allegation of fraud or coercion here so I must look for other factors suggesting procedural unconscionability such as: "'the take-it-or-leave-it nature of the standardized form of the document[,]' 'the parties' relative bargaining positions,' and 'the degree of economic compulsion motivating the 'adhering' party.'" *Quilloin*, 673 at 236 (quoting *Salley*, 925 A.2d at 125) (cleaned up).

The Third Circuit did not find procedural unconscionability where a highly educated economist willingly accepted an offer of employment and did not allege that he lacked an opportunity to negotiate. *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 229 (3d Cir. 2008). Neither did the Third Circuit find procedural unconscionability where the plaintiff employee was a college graduate with a business administration degree and did not claim that she failed to read the arbitration agreement or that she was coerced into signing it. *Great Western Mortg. Corp. v. Peacock*, 110 F.3d 222, 229-230 (3d Cir. 1997). Instead, the plaintiff in *Peacock* relied on the argument that she was in an unequal bargaining position because she was a weak employee signing a form agreement—and that was not enough. *Id.* The Third Circuit has also upheld an arbitration agreement where the rules to be followed were not specifically

outlined in the agreement but merely identified by a link to the arbitration provider's website. *Edwards v. Hovensa LLC*, 497 F.3d 355, 356-57 (3d Cir. 2007).

In contrast, the Third Circuit has found procedural unconscionability where an employee was instructed to read and sign an employment contract without being given an opportunity to negotiate over its terms and was dependent on the employer, one of the world's largest jewelry retailers, for his immigration status and his "very capacity to work." *Nino*, 609 F.3d at 196-97, 202. The Third Circuit also found procedural unconscionability where the arbitration agreement was between a multi-national business and crane operators with "limited educational backgrounds and, at best, very narrow options for other employment." *Alexander*, 341 F.3d at 266.

Plaintiff's case lands somewhere between these competing precedents. As in *Zimmer*, plaintiff here did not allege that she lacked an opportunity to negotiate the terms of the agreement. And like the plaintiff in *Quilloin*, plaintiff did "not contend that she failed to read the document containing the arbitration agreement, or that she was coerced into signing it." Nor did she allege that she failed to fully comprehend the terms at the time of signing and, in fact, the contractual language is not particularly technical or ambiguous. Rather, it notes three times, in clear language, that Plaintiff was giving up her right to access a court. She agreed that disputes "will be resolved by Arbitration and NOT by a court or jury," that she "forever waive[d] and g[a]ve up the right to have a judge or a jury decide any Covered Claims," that she "must submit [her] claim[s] to arbitration" and that she was "giving up the right to have Covered Claims decided by a court or jury." Defs.' Mot. Dismiss Ex. B. The last of these phrases was printed in what appears to be size 11 font, among just five bullet points directly above the space for Plaintiff's signature. *Id.* It was not buried in a mountain of text. The whole agreement was but

three pages long.  And though the arbitration rules to be used were identified by a link to the arbitration provider's website—hardly a best practice—the Third Circuit upheld another arbitration agreement structured the same way.  *Edwards*, 497 F.3d at 355, 356-57.

There are factors weighing against enforceability, including a degree of inequality in bargaining power. At the time Plaintiff was asked to sign the arbitration agreement, she had already been working for Defendants for over two years and was being offered a promotion.  She could take it or leave it.  If she didn't agree to arbitration, she'd lose her job.  Pl.'s Resp. Defs.' Mot. Dismiss 13.  Plaintiff does not posit specific facts about her financial situation but simply asserts that she was economically compelled to accept the agreement.  *Id.* 14.  This lack of specificity along with a lack of information about the circumstances under which she was asked to sign the documents make it difficult to assess the degree of compulsion.  But I think it is plausible that, when presented with a job or no job scenario, Plaintiff didn't feel that she had a meaningful choice.  *See Quilloin*, 673 F.3d at 235-37.

The other troubling fact is a term in the agreement noting that Plaintiff's "signature and/or acknowledgment of th[e] Agreement is not required for the Agreement to be enforced." Defs.' Mot. Dismiss Ex. B.  Simply by continuing to work, Plaintiff triggered the enforcement of the arbitration agreement and was "deemed to have consented to, ratified and accepted th[e] Agreement."  *Id.*  This provision is worthy of greater scrutiny, but that must wait for another case, because Plaintiff here signed, thereby formally accepting the agreement to arbitrate.

Like Judge Schiller in *Porreca v. Rose Group*, 2013 WL 6498392, at *16 (E.D. Pa. Dec. 11, 2013), I see troubling features in this arbitration agreement that suggest some degree of procedural unconscionability.  But because Plaintiff's arguments as to substantive

unconscionability have been rejected by higher courts, this is not a case where even a sliding-scale analysis would release Ms. Styczynski from her agreement to arbitrate.

Judge Schiller's reasoning in *Porreca* applies equally here. Even under the Third Circuit's sliding scale approach, this case does not present a sufficiently egregious example of procedural unconscionability to make up for the lack of substantive unconscionability. The Supreme Court has rejected most of Plaintiff's general arguments on substantive unconscionability and the remainder lack force. The arbitration agreement is therefore valid.

    C.   This Dispute Over Alleged Harassment, Discrimination, and Retaliation Arising Out of Plaintiff's Employment with Defendants Falls Squarely Within the Scope of the Arbitration Agreement.

Having determined that the arbitration agreement here is valid, I must ensure that Plaintiffs' claims fall within its scope before I refer this case to arbitration. *Trippe Mfg. Co.*, 401 F.3d at 532 (3d Cir. 2005). Plaintiff concedes that her claims fall within the broad scope of the agreement and, reviewing the agreement myself, I agree.

The plain terms of the agreement state that covered claims "subject to a confidential arbitration" include claims "*against MarketSource and/or any of its . . . affiliates*" including all "*discrimination and/or harassment claims; retaliation claims*; . . . and *any other claim under any federal, state*, or local statute, constitution, regulation, rule, ordinance, or common law, *arising out of and/or directly or indirectly related to* my application for employment with the Company, and/or my *employment with the Company*, and/or the terms and conditions of my employment with the Company, and/or termination of my employment with the Company." Defs.' Mot. Dismiss Ex. B (emphasis added). All of Plaintiff's discrimination, harassment, and retaliation claims under federal and state law arise out of and directly relate to her employment with MarketSource and its affiliate Allegis and are therefore subject to the Agreement.

D. <u>Defendants Did Not Waive Their Right to Arbitrate.</u>

Plaintiff's final argument is that Defendants MarketSource and Allegis waived their right to arbitrate by delaying their demand for arbitration. Pl.'s Resp. Defs.' Mot. Dismiss 23-24. They should, she argues, have made their demand for arbitration at some point during the EEOC proceedings and not waited until after Plaintiff filed suit in this court. This argument is meritless. I am aware of no procedure whereby Defendants could have forestalled the EEOC proceedings in favor of arbitration. In fact, the agreement itself contemplates that arbitration would *follow* an EEOC or other administrative proceeding. The relevant provision states:

> While I have the right to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board ("NLRB"), the Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency, if any federal, state or local administrative proceeding does not finally resolve the Covered Claim, the parties must submit the claim to arbitration under this Agreement.

Defs.' Mot. Dismiss Ex. B.

This provision makes clear that Plaintiff retained the right to file a charge with the EEOC, but that if the EEOC proceeding did not "finally resolve" the claim, she "must submit the claim to arbitration." *See id.* The EEOC did not finally resolve Plaintiff's claims but Plaintiff did not proceed to arbitration per the agreement. Instead, she filed suit in this court by her complaint dated June 25, 2018. Pl.'s Compl., ECF No. 1. She filed her amended her complaint on August 17, 2018. Pl.'s Am. Compl., ECF No. 7. Less than two weeks later, on August 30, 2018, Defendants filed their motion to dismiss or stay proceedings pending arbitration and filed no responsive pleading. Defs.' Mot. Dismiss, ECF No. 8-1. This was entirely proper and timely under Fed. R. Civ. P. 12(a) and (b). Plaintiff points to no procedure whereby Defendants could have moved to dismiss the EEOC proceedings in favor of arbitration.

Plaintiff's reliance on *Hoxworth v. Blinder*, 980 F.2d 912 (3d Cir. 1992), is misplaced. There, the Third Circuit concluded that defendants waived their right to arbitration by actively litigating the case for nearly a year before filing their motion to compel. Defendants here did not. *See also Gavlik Constr. Co. v. H.F. Campbell Co.*, 526 F.2d 777 (3d Cir. 1975) (abrogated on other grounds) (no waiver where defendant moved for a stay pending arbitration immediately after removing the case to federal court).

Nor can Plaintiff show prejudice, which is "the touchstone for determining whether the right to arbitrate has been waived." *Hoxworth*, 980 F.2d at 925. Unlike the Defendants in *Hoxforth*, MarketSource and Allegis Group have not litigated the merits of Plaintiff's claims, engaged in discovery, or done anything in this court other than demand arbitration. In sum, Defendants have timely asserted their right to arbitrate, not waived it.

E. <u>Reconsidering the Effects of Mandatory Arbitration in Employment Cases</u>

Although I will enforce the arbitration agreement in this case, broader issues underlie Plaintiff's objections. Seventeen years ago, the U.S. Supreme Court perceived "real benefits to the enforcement of arbitration provisions" in the employment context, including avoidance of litigation costs. *Circuit City Stores*, 532 U.S. at 122-23. And, in *Gilmer*, the Court determined that arbitration was a comparable alternative to litigation. 500 U.S. 20, 30-32 (1991). But it is not clear that, at the time those opinions were issued, there was data to support those assumptions. In the years since, scholars have continued to test those assumptions and have seemingly unsettled the notion that arbitration is superior or even sufficiently comparable to litigation. There is certainly some data suggesting that the arbitral forum's downsides may outweigh its benefits, at least for vulnerable workers. *See* Cynthia Estlund, *The Black Hole of Mandatory Arbitration*, 96 N. C. L. Rev. 679 (2018). Agreements by employees to arbitrate

disputes arising out of the employment relationship are now routinely imposed as a condition of employment; the best data we have suggests that "roughly 20% of the non-unionized American workforce," or 25 million workers, "is covered by mandatory arbitration provisions." Jean R. Sternlight, *Disarming Employees: How American Employers Are Using Mandatory Arbitration to Deprive Workers of Legal Protection*, 80 Brook. L. Rev. 1309, 1310 (2015) (citing Alexander J.S. Colvin, *Empirical Research on Employment Arbitration: Clarity Amidst the Sound and Fury?*, 11 Emp. Rts. & Emp. Pol'y J. 405, 411 (2007)).

One empirical study found that employee win rates in the arbitral forum are significantly lower than in employment litigation trials; median award amounts in arbitration are five to ten times lower than awards reported in employment litigation; and there is strong evidence of a repeat employer-arbitrator bias where employees win less often and receive smaller awards when the same arbitrator is involved in multiple cases with the same employer. Alexander J. S. Colvin, *An Empirical Study of Employment Arbitration: Case Outcomes and Processes*, 8 J. Emp. Legal Stud. 1, 1-14 (2011) (finding that employees win 23.4% of cases that don't involve a repeat-employer-arbitrator pairing but only 12.0% of cases involving a repeat pairing and that the average damage award was $27,039 in cases not involving a repeat pairing but only $7,451 in cases involving a repeat-employer-arbitrator pairing). A survey of "a growing body of empirical research suggests arbitration's ultimate effect is to impose a diluted brand of justice on employee claimants . . . [where] employees win less often and receive smaller monetary awards in arbitration." Mark D. Gough, *The High Costs of an Inexpensive Forum: An Empirical Analysis of Employment Discrimination Claims Heard in Arbitration and Civil Litigation*, 35 Berkeley J. Emp. & Lab. L. 91, 93 (2014). After analyzing 700 employment discrimination cases and accounting for differences in case characteristics, this researcher found that "employees are

nearly forty percent more likely to win and receive average awards nearly twice as large in cases adjudicated in the civil litigation system compared to those that are arbitrated."). *Id.* at 112. Another researcher found a somewhat less pronounced, but nonetheless real effect, concluding that "the mere fact that an employee faces an extreme repeat-playing company decreases the odds of winning by a statistically significant degree but does not affect damages." David Horton & Andrea Cann Chandrasekher, *Employment Arbitration after the Revolution*, 65 DePaul L. Rev. 457, 496 (2016). Pro se claimants might fare even worse. *See* Alexander J.S. Colvin & Kelly Pike, *Saturns and Rickshaws Revisited: What Kind of Employment Arbitration System Has Developed?*, 29 Ohio St. J. Disp. Resol. 59, 78 (2014) (finding that self-represented employees are a third less likely to prevail in arbitration and, if they do win, they receive an average award of $11,071 versus the $99,217 average award recovered by represented employees).

More troubling still is the likelihood that a substantial number of employees who have claims covered by arbitration agreements are not filing at all. *See* Cynthia Estlund, *The Black Hole of Mandatory Arbitration*, 96 N. C. L. Rev. 679, 691-93 (2018). This review suggests that there may be as many as 315,000 to 722,000 "missing" arbitration cases annually. *Id.* at 696. Based on the general rate of employment litigation and the number of employees covered by mandatory arbitration agreements, "well under two percent of employment claims that one would expect to find in some forum, but that are covered by [mandatory arbitration agreements], ever enter the arbitration process." *Id.* "[T]he available evidence suggests that the overwhelming majority of claims that would have been litigated but for the presence of a [mandatory arbitration agreement] are simply dropped without being filed at all." *Id.* at 698. This researcher suggests that arbitration is so "inhospitable to claimants that they routinely give

up their claims" and hypothesizes that it would be economically irrational for plaintiff-side attorneys to take on many cases that involve mandatory arbitration clauses.[5] *Id.* at 700-06.

Plaintiff cites an EEOC policy statement issued in 1997, and never rescinded, that underscores these concerns. U.S. Equal Emp. Opportunity Comm'n, *Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment*, Notice No. 915.002 (July 10, 1997), https://www.eeoc.gov/policy/docs/mandarb.html. It cautioned that "[t]he private arbitral system differs in critical ways from the public judicial forum and, when imposed as a condition of employment, it is structurally biased against applicants and employees." *Id.* The EEOC also "believes that . . . [a]though binding arbitration does not, in and of itself, undermine the purposes of the laws enforced by the EEOC . . . this is the result when it is imposed as a term or condition of employment." *Id.* The EEOC concluded that such agreements harm both the individual civil rights claimant and the public interest in eradicating discrimination." *Id.*

In light of the growing body of empirical research and the EEOC's admonition, courts must continue to scrutinize the fairness of mandatory arbitration, especially in employment cases. To quote from Judge Schiller's eloquent analysis:

> There is a reason that arbitration is the favored venue of many businesses for deciding employment disputes, and it is not to ensure that employees are afforded the best chance to have their claims adjudicated by a judge or jury picked from the community.

*Porreca*, 2013 WL 6498392, at *16 (E.D. Pa. Dec. 11, 2013).

---

[5] Scholars are hardly unanimous. Several researchers suggest that concerns with mandatory arbitration in employment cases may not be supported by the available data. *See, e.g.*, David Sherwyn et al., *Assessing the Case for Employment Arbitration: A New Path for Empirical Research*, 57 Stan. L. Rev. 1557 (2004).

It bears mention that similar concerns were raised by Chief Justice Warren Burger some twenty years earlier:

> Plainly, it would not comport with the congressional objectives behind a statute seeking to enforce civil rights protected by Title VII to allow the very forces that had practiced discrimination to contract away the right to enforce civil rights in the courts. For federal courts to defer to arbitral decisions reached by the same combination of forces that had long perpetuated invidious discrimination would have made the foxes guardians of the chickens.

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 750 (1981) (Burger, C.J., dissenting).

The concerns addressed above are not intended as an indictment of JAMS, a highly respected alternative dispute resolution service that I retained as a practitioner. Both JAMS and the American Arbitration Association, the other of the country's two largest arbitration firms, take seriously their responsibility to eliminate bias and conflicts. But just as the judiciary has come to recognize the challenges judges face in overcoming implicit bias on racial and ethnic grounds,[6] we must consider the inherent problems presented by a for-profit system of dispute resolution that addresses important issues of federal law without the same transparency and error-correcting mechanisms as the courts.

Around the time Judger Schiller published his opinion, a major media outlet was researching the growth of arbitration. *See* Jessica Silver-Greenberg & Michael Corkery, *In Arbitration, a 'Privatization of the Justice System;' Beware the Fine Print*, N.Y. Times, Nov. 1, 2015. Research done by the press is not always conducted with the same rigor as academic research, but the ability of reporters to engage directly with participants in a system sometimes

---

[6] *See, e.g.*, Jerry Kang, *Implicit Bias: A Primer for Courts,* National Center for State Courts (2009); Justin D. Levinson et al., *Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev. 63 (2017).

yields insights that fall outside the ken of academia. More than three dozen arbitrators, including those working for JAMS and AAA, told the *New York Times* that "they felt beholden to companies. Beneath every decision, the arbitrators said, was the threat of losing business." *Id.* One arbitrator confessed that "plaintiffs had an inherent disadvantage," saying, "'[w]hy would an arbitrator cater to a person they will never see again?'" *Id.* And *The Times* found that a JAMS arbitrator in an employment case had 29 cases involving the same company. *Id.*

Even if individual arbitrators adhere to high standards, we ignore reality if we forget that private arbitration services are profit-making enterprises that advertise and compete for business. An arbitrator in Boston explained that "after a company complained that she had scheduled an extra hearing for a plaintiff, the arbitration firm she was working with canceled it behind her back." *Id.* At a minimum, an employer that regularly uses a single provider to resolve disputes will have superior insight into how individual arbitrators have ruled in earlier cases.

Like Judge Schiller, I am bound by the rulings of higher courts. "[T]he plain language of [the Federal Arbitration Act] affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration." *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3d Cir. 2004). Only those courts, or Congress, can address the policy issues raised by motions such as this. But as research into the operation, outcomes, and effects of mandatory arbitration continues to accumulate, the assumptions that led the Supreme Court to embrace it will continue to be tested.

**IV.     Conclusion**

For the foregoing reasons, I grant Defendants' motion to stay the proceedings in this Court pending the completion of arbitration and refer this dispute to arbitration per the terms of the agreement.  An appropriate Order follows.

_____/s/ Gerald Austin McHugh_
United States District Judge